John R. PARKS and Norma Parks, Plaintiff,

v.

UNITED STATES of America, Defendant.

Civ. No. CA3–74–1060–F.

United States District Court,
N. D. Texas,
Dallas Division.

April 18, 1977.

Roger J. Allen, Dallas, Tex., for plaintiff.

Ken J. Mighell, Wm. W. Guild, Dept. of Justice, Tax Div., Dallas, Tex., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

ROBERT W. PORTER, District Judge.

This cause came on for hearing by the Court, sitting without a jury, at Dallas, Texas, on February 7, 1977. After considering the evidence and arguments of counsel, the Court makes and enters the following findings of fact and conclusions of law.

## FINDINGS OF FACT

1. Plaintiffs, John R. Parks, Jr., and Norma Parks, seek a refund of income tax for calendar year 1968 in the amount of $4,052.03. Norma Parks is a party-plaintiff in this cause of action solely by virtue of the fact that she and her husband, John R. Parks, Jr., executed and filed a joint income tax return in each of the years involved in the determination of this action. Defendant, United States of America, by way of counterclaim, seeks a judgment against plaintiffs with respect to income tax for calendar year 1968 in an amount of $84,-167.97.

2. The relief sought by each of the parties herein, while involving calendar year 1968 income taxes, grows out of transactions reported on plaintiffs' income tax return for calendar year 1971. For calendar year 1971, plaintiffs reported a loss from Lakeview Apartments Ltd., a limited partnership, in an amount of $194,572. The plaintiffs sought to deduct this amount on their 1971 income tax return. The presence of this deduction on such return gave rise to a net operating loss which plaintiffs carried back to calendar year 1968. After filing their 1971 income tax return, plaintiffs also filed an application for a tentative refund from carryback of net operating loss or unused investment credit, Form 1045, with the Internal Revenue Service, showing a tentative refund due with respect to 1968 of $84,167.97. On May 31, 1972, this amount, together with interest of $2,098.43, was refunded to plaintiffs by the Internal Revenue Service. On July 10, 1972, additional interest of $987.81 was refunded to plaintiffs.

3. Plaintiffs owned a limited partnership interest in Lakeview Apartments Ltd., which they acquired on December 13, 1971. Their limited partnership interest entitled them to 88 percent of the profits or losses of Lakeview Apartments Ltd. However, through an unexplained mistake, plaintiffs only deducted an amount equal to 75 percent of the loss shown by Lakeview Apartments Ltd., for 1971, or $194,572, on their 1971 return. In 1974, plaintiffs discovered this error, and on January 30, 1974, they

filed a claim for refund with the Internal Revenue Service in an amount of $4,052.03. The amount of this refund claimed for 1968 reflected the additional loss carryback to 1968 from 1971 as a result of plaintiffs receiving 88 percent of the claimed losses for Lakeview Apartments Ltd., rather than just 75 percent of those losses, as originally reported on their 1971 return.

4. During 1974, the Internal Revenue Service conducted an income tax audit with respect to the partnership return, Form 1065, filed by Lakeview Apartments Ltd., for 1971. As a result of this audit, the Internal Revenue Service determined that substantially all of the deduction items reported on the 1971 partnership return were not allowable for 1971. The disallowance of these deductions at the partnership level resulted in the disallowance of the proportionate partnership loss claimed by plaintiffs on their 1971 return. In turn, this caused the Internal Revenue Service to disallow plaintiffs' 1974 claim for refund and make an assessment against plaintiffs with respect to the tentative loss carryback refund which they had previously been allowed on May 31, 1972. Thus, on January 27, 1975, plaintiffs were assessed additional income taxes for 1968 in the amount of $84,167.97, plus accrued interest of $15,509.96.

5. On October 29, 1974, more than six months after having filed their 1974 refund claim, but prior to the assessment of additional taxes referred to above, plaintiffs filed their complaint herein. After the additional assessment referred to above was made by the Internal Revenue Service, the defendant, by amendment to its answer, counterclaimed for the additional taxes assessed for 1968 in the amount of $84,167.97, plus interest as allowed by law.

6. The issue presented by this case is whether the deduction items taken on Lakeview Apartments Ltd.'s 1971 partnership income tax return were proper. Specifically, the following deduction items from the partnership's 1971 return must be scrutinized:

| | | |
|---|---|---|
| (A) | Initial Service Charge | $ 50,124.00 |
| (B) | FNMA Fee | 37,593.00 |
| (C) | FNMA Discount | 100,248.00 |
| (D) | FHA Inspection Fee | 12,531.00 |
| (E) | Bond Premium | 13,877.00 |
| (F) | FHA Examination Fee | 7,518.00 |
| (G) | Supervisory Fee | 25,000.00 |

On the 1971 partnership return each of the above items, with the exception of the supervisory fee, was deducted as interest expense.

7. Lakeview Apartments Ltd., a limited partnership, was formed to construct and operate the Lakeview Apartments in Kansas City, Missouri. The apartments were to be operated as a housing project under Section 221(d)(4) of the National Housing Act of 1968. Construction of the project apparently did not commence until very late in December, 1971, or in early 1972. Interests in the limited partnership were marketed to potential investors on the basis of their immediate potential to generate a tax shelter, and to a lesser extent, on the basis of the potential for capital gains by the investor upon resale of his interest to another investor who would be interested in a tax shelter. It was not projected that the project would show a taxable profit for at least the first seven or eight years of its existence. Plaintiffs purchased their interest in the limited partnership primarily as a tax shelter vehicle, with the potential for future capital gains on resale of their interest having a secondary impact on their decision.

8. In purchasing their interest in the limited partnership, plaintiffs were required to make an immediate cash payment of $125. In addition, plaintiffs were to pay the seller, American Housing Resources, Inc., the sum of $64,000 on January 10, 1972, and additional payments of $74,270 each on January 10th of each succeeding year through 1977. The 1972 payment, however, could be made in the form of a negotiable promissory note due and payable six months from January 10, 1972, and bearing interest at the rate of 6½ percent. It was anticipated that plaintiffs would be able to make each of the payments called for out of income tax refunds to be generated to them through their distributable share of partnership loss.

9. The financing for the apartment project was done on an interim basis during the construction period through funding made available by Chemical Bank of New York City, in a total amount of $2,506,200. This interim financing was to be insured by the FHA. Assuming that all terms and conditions of the financing arrangements were met, when construction was completed, the financing would be assumed by the Federal National Mortgage Association (FNMA) in the amount of $2,506,200. It was anticipated that FNMA would purchase the loan from Chemical Bank on or about July 1, 1973, when it was projected that construction would be completed. The loan would then be amortized over the following forty years, through June 1, 2013. All of the financing for the project was on a nonrecourse basis, with none of the partners nor the partnership being personally liable.

10. We turn now to the deduction items under scrutiny herein. The first item, an initial service charge in the amount of $50,-124, was an amount equal to 2 percentage points (2 points) of the total loan, and was charged by Chemical Bank. The defendant has raised no contention herein that the 2 points were not an interest item. However, only one-half of this amount, or $25,062, was charged by Chemical Bank at the outset of the loan, and was attributable to the first thirteen months of the loan. The remaining one-half, or $25,062, was held in escrow by Chemical Bank, to be charged rateably, $1/18$ in each month, during the fourteenth and subsequent months of the loan. To the extent that construction was completed ahead of schedule, and the loan purchased by FNMA ahead of schedule, that portion of the escrowed amount which had not yet been debited by Chemical Bank from the escrow account was to be applied to the FNMA discount of $100,248. In addition, although the amount of $50,124 was due at the beginning of the loan, it was funded out of the loan proceeds disbursed by Chemical Bank. Chemical Bank made the first disbursement of loan proceeds, in the amount of $295,735, on December 13, 1971. In accordance with the terms of the financing, this disbursement was insured by the FHA. The 2-point initial service charge of $50,124 was one of the items making up this initial disbursement. Pursuant to the terms of the financing agreements, all FHA-insured disbursements were obligated to be applied by the partnership to the items and in the amounts listed on the application for the advance or disbursement. Thus, when the partnership received the first disbursement of $295,735 from Chemical Bank, it was obligated to immediately pay $50,124 of that amount back to Chemical Bank for the 2-point initial service charge listed on the application for the advance. The Internal Revenue Service disallowed the partnership's attempt to deduct the total amount of $50,124 in 1971, requiring the partnership to amortize that amount over the period of the interim construction financing provided by Chemical Bank.

11. The FNMA fee in the amount of $37,593 was a 1.5-point charge by FNMA, and collected by Chemical Bank. Of this amount, 1 point was a purchase commitment fee, and ½ point was a purchase and marketing fee. The parties are in dispute as to the correct treatment of the ½ point which was a purchase and marketing fee. The partnership attempted to deduct the purchase and marketing fee as an item of interest, while the Internal Revenue Service disallowed this deduction, and amortized the ½ point over the term of the permanent financing. The purchase and marketing fee was a service charge imposed by FNMA to process and handle the permanent financing; it was not additional interest.

12. The 4 percent (4-point) FNMA discount, in the amount of $100,248, was in substance an additional interest charge to be exacted by FNMA. However, pursuant to the terms of the financing, collection of this amount was to be deferred until construction was completed. The partnership was merely required to deliver a note in the amount of $100,248 to Chemical Bank, FNMA's collection agent, in December of 1971. The note was not due until July of 1973, and no interest was to be charged on

the note through that period of time. The partnership initially executed such a note. On December 30, 1971, however, one of the limited partners made an additional contribution to the partnership of $100,248, and on that same date, the partnership mailed a check to Chemical Bank in that same amount in payment of the FNMA discount. Thus, the partnership attempted to prepay the discount, although it was not due for eighteen months. Moreover, in 1973, when the discount became due and payable to FNMA, it was allowed as a certified cost item and paid out of the FHA-insured loan proceeds. At that time, the amount of $100,248 transmitted to Chemical Bank in 1971 by the partnership was accounted for as a contribution of funds for construction costs by the partners. Therefore, the check for $100,248 transmitted by the partnership in 1971 was at most, only an unrequired deposit for a future obligation which was, in fact, funded out of loan proceeds in 1973. It was not a payment of interest in 1971.

13. If the payment of $100,248 by the partnership in 1971 had been a legitimate interest payment in that year, it would nevertheless have been a prepayment. Its allowance as a deduction in full to the partnership in 1971 would have resulted in a material distortion of income with respect to the partnership, since the partnership realized no income items in 1971. Indeed, the partnership was only in existence during a portion of the last month of 1971. Likewise, its allowance would have resulted in a material distortion of plaintiffs' income in 1971, since plaintiffs' taxable income in 1971 before taking into account their share of any partnership loss would have been $27,796.90. Plaintiffs' share of the $100,248 item would have been $88,218. The magnitude of this amount in relation to plaintiffs' otherwise taxable income would cause a material distortion of plaintiffs' income.

14. The Internal Revenue Service disallowed the partnership's attempted deduction of $100,248 with respect to the 4-point FNMA discount in 1971, and required the partnership to amortize that item over the 40-year period during which the permanent financing would be outstanding.

15. The partnership sought to deduct $12,531 paid for an FHA inspection fee as an interest item in 1971. The Internal Revenue Service required the partnership to capitalize the item and amortize it over the life of the financing. The FHA inspection fee was a charge exacted by the FHA to compensate it for its inspection of the progress of construction on the project, incident to providing FHA insurance on the loan.

16. The partnership also sought to deduct a bond premium in the amount of $13,877 as interest expense. This amount was paid by the partnership to the general contractor who was constructing the apartment complex as reimbursement for a bond premium previously paid by the contractor incident to undertaking the construction project. The bond premium paid by the contractor was a part of the overall cost of acquiring or erecting the apartment complex. The Internal Revenue Service disallowed the claimed deduction, and required the partnership to capitalize it.

17. The partnership sought to deduct an FHA examination fee in the amount of $7,518 as interest expense on its 1971 return. This item was, in fact, an application and commitment fee charged by FHA as a service charge incident to providing the mortgage insurance on the financing. It was not an item of interest expense. The Internal Revenue Service disallowed the deduction, and required the partnership to amortize the item over the 40-year term of the permanent financing.

18. The last item which the partnership sought to deduct and which was questioned by the Internal Revenue Service was a supervisory fee in the amount of $25,000, which was paid to the general partner by the partnership. The supervisory fee was paid to compensate the general partner for monitoring the construction work to be done by the general contractor incident to erecting the apartment complex. Thus, it was a charge similar to an architectural fee or engineering fee, and was a cost of erecting or acquiring an asset, the apartment

complex. The Internal Revenue Service disallowed the attempted deduction of the entire amount of $25,000 in 1971, and required the partnership to amortize the supervisory fee.

19. With the exception of the supervisory fee and the 4-point FNMA discount, all of the other disputed deduction items discussed above were paid in the same manner as the 2-point initial service charge which was described previously. That is, each item was a component part of the initial draw of insured loan proceeds, and, under the terms of the financing agreements, was required to be applied to each item in the amount for which a deduction was sought.

20. The partnership filed its income tax return using the cash receipts and disbursements method of accounting.

21. Any conclusion of law deemed to be a finding of fact is hereby adopted as the same.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction of this matter pursuant to 28 U.S.C. §§ 1340, 1346(a)(1), and 1346(c).

2. As a cash-basis taxpayer, the partnership did not "pay" the 2-point initial service charge of $50,124 in 1971, since the loan fee was, in substance, merely withheld by the lender from the principal amount of the loan. This amount would not actually be paid except rateably over the life of the loan, i. e., forty years, as the partnership repaid the principal amount thereof. *Rubnitz v. Commissioner*, 67 T.C. 45 (1977); *Campbell v. Commissioner*, P–H Memo T.C. par. 70,126 (1970); *Keith v. Commissioner of Internal Revenue*, 139 F.2d 596 (C.A. 2, 1944); *Cleaver v. Commissioner of Internal Revenue*, 158 F.2d 342 (C.A. 7, 1946), cert. denied, 330 U.S. 849, 67 S.Ct. 1093, 91 L.Ed. 1293 (1947); *Hart v. Commissioner of Internal Revenue*, 54 F.2d 848 (C.A. 1, 1932); *Quinn v. Commissioner of Internal Revenue*, 111 F.2d 372 (C.A. 5, 1940). The Internal Revenue Service's treatment of this item was therefore correct.

3. That portion of the FNMA fee, ½ point, which was a purchase and marketing fee, was a service charge exacted by FNMA. As such, it was an expenditure properly attributable to the entire term of the permanent financing arranged for the partnership, and should have been amortized over that period of time. *Lovejoy v. Commissioner*, 18 B.T.A. 1179 (1930); *Anover Realty Corp. v. Commissioner*, 33 T.C. 671 (1960). Thus, the treatment by the Internal Revenue Service was correct.

4. The 4-point FNMA discount, in the amount of $100,248, was a mere deposit in 1971. It was not due until 1973, and, although the partnership forwarded a payment of $100,248 to Chemical Bank in 1971, the 4-point payment was actually funded in 1973 as a portion of the FHA-insured loan proceeds. At that point, the 1971 deposit of $100,248 by the partnership was treated as capital contributed by the partnership for construction costs. A deposit is not a deductible business expenditure; rather, it creates an asset. Treasury Regulations on Income Tax (1954 Code), § 1.461–1(a)(1) (26 C.F.R.); *Stice v. United States*, 540 F.2d 1077 (C.A. 5, 1976). Moreover, even if the payment of $100,248 in 1971 had been an interest expenditure in that year, it would have been prepaid interest, since, pursuant to the terms of the financing, such amount was not due until 1973. The partnership received no items of income in 1971; indeed, the partnership was only active for the last eighteen days of 1971. Thus, a prepaid interest item of $100,248 in 1971 would have distorted the partnership's income in a very substantial manner. Likewise, plaintiffs' income in 1971 would have been materially distorted if this item was allowed as pointed out above at paragraph 13 of the findings of fact. In either case, such a tax accounting procedure would not have clearly reflected income, pursuant to the requirements of Section 446 of the Internal Revenue Code of 1954 (26 U.S.C.). It would thus be within the proper exercise of the discretion invested in the Commissioner of Internal Revenue by Section 446(b), to require the partnership or plaintiffs herein to amortize the 4-point

FNMA discount over the period of the financing to which it was attributable. *Sandor v. Commissioner of Internal Revenue,* 536 F.2d 874 (C.A. 9, 1976); *Resnick v. Commissioner, supra; Cole v. Commissioner,* 64 T.C. 1091 (1975); *Burck v. Commissioner of Internal Revenue,* 533 F.2d 768 (C.A. 2, 1976). Thus, the treatment of this item by the Internal Revenue Service was correct.

■ 5. The FHA inspection fee and the FHA examination fee were costs of obtaining FHA-insured financing. Each was a charge exacted by FHA as compensation for services rendered by it in connection with the financing arranged by the partnership. As such, these fees were capital expenditures, and it was proper for the Internal Revenue Service to require that they be amortized over the life of the permanent financing. *Cagle v. Commissioner of Internal Revenue,* 539 F.2d 409, 416 (C.A. 5, 1976); *Detroit Consolidated Theaters v. Commissioner of Internal Revenue,* 133 F.2d 200 (C.A. 6, 1942); *Enoch v. Commissioner,* 57 T.C. 781, 794 (1972).

■ 6. The bond premium, for which the partnership reimbursed the general contractor, was a cost of construction of the project. This was an expenditure for the acquisition of a capital asset, and thus was a capital expenditure. Thus, this item was properly capitalized by the Internal Revenue Service. *Cagle v. Commissioner of Internal Revenue, supra,* p. 415; *Perlmutter v. Commissioner,* 44 T.C. 382, 403 (1965).

■ 7. The supervisory fee in the amount of $25,000 paid by the partnership in 1971 was also properly characterized by the Internal Revenue Service as a capital expenditure. *Cagle v. Commissioner of Internal Revenue, supra,* p. 416.

8. Any finding of fact deemed a conclusion of law is hereby adopted as the same.

9. Defendant is entitled to judgment in its favor on its counterclaim, to dismissal of plaintiffs' complaint with prejudice, and to its costs. Defendant is directed to prepare an appropriate form of judgment in conformity with the Court's findings of fact and conclusions of law, and to present the same to counsel for plaintiff for approval as to form and computation of amount.